Curia, per Richardson, J.
Whether Amelia Marchant can a witness, competent, statutes South Carolina, to give evidence in the courts of justice of this State, is the question to be decided.
For the purpose of the discussion, we are to assume, that Amelia Marchant is not descended from Indian slaves, nor her blood mixed, in any degree, with that of the African race, called in pur Acts, “ negroes, mulattoes and mustizoes.”
endre class of such persons are incompetent witnesses> an(i oome under the disabilities of the Act of Í740. But Amelia Marchant is of free Indian descent, mixed with the blood of the race of white men; and the objection to her legal *ss t^at ^ express enactment of the Act of 1740, she belongs to the same class, and is, of course, ren-incompetent, in common with “Indian slaves, negroes, mulattoes and mustizoes, and their issue.”
*449 The question is to be decided by the terms, the sense, and by the State policy of the Act of 1740; to wit: “That negroes and Indians, (free Indians in amity with this government, and negroes, mulattoes and mustizoes, who are now free, excepted,) mulattoes who noware,or shall hereafter be, in this Province, and all their issue and offspring, born or born, shall be, and they are hereby declared to be, and remain forever hereafter, absolute slaves, and shall follow the condition of the mother, and shall be deemed, held, taken, reputed and adjudged, in law, to be chattels personal, in the hands of their owners and possessors, and their executors, administrators and assigns, to all- intents, constructions and purposes whatever.”
The Act next provides for the manner in which any supposed slaves claiming to be free, may shew:their right to freedom. “ Provided always, that in any action or suit to be brought in pursuance of the direction of this Act, the bur-then of the proof shall lay on the plaintiff; and it shall be always presumed that every negro, Indian, mulatto and mus-tizoe is a slave,, unless the contrary can be .made appear; the Indians in amity with this government excepted, in which case, the, burthen of the proof shall lie on the defendant.”
The entire argument rests upon this inquiry: Is, or not, Amelia Marchant to be presumed in law to be of the class of Indians called “ Indians in amity with this government,” which are so excepted from the legal disabilities attached, by the Act, “Indian slaves, negroes, mulattoes and mustizoes.” As to the whole African negro race, I took occasion on Monday last, in the case of Vinyard v. Passalaigue, to expound our strict legal and State policy, in placing them under legal disabilities. The aim, in the present case, will be to prove that free Indians are entirely exempt from:such disabilities; because the legal presumption is, that all such free Indians are of the class of “ Indians in amity.” As far as the practice in this State can weigh, or past adjudications have authority, the proper construction of the exception of ■“ Indians in amity,” is in favor of the legal competency of Amelia Marchant.
For instance, free Indians have been invariably tried by a Judge and jury, and not under the Act of 1740, by Justices and freeholders. In ■ practice, the instances are abundant. The case of Adam Garde?i, of Indian descent, was so ruled by Judge Grimke, in 1814. So also the case of Eliza Garden, ruled by Judge Axson in 1836. The case of Terrett and others. In this case of capitation tax of the city, the court draws the distinction between the free Indian and “persons of color,” L e. unmixed with African blood.
It is needless, and would be tedious, to comment upon all such illustrations, and I borne directly to the final case of *450 Charlotte Miller v. Dawson and Brown, Justices, who were proceeding to try her under the Act of 1740.
In this case, it was unanimously decided by this court in 1836, that the words of the Act of 1740, to wit: “ free Indians in amity with this government,” mean Indians domiciled in this State, although disconnected with any tribe of Indians, and do not mean merely Indians preserving a national character, and in amity with this State. Accordingly, a prohibition issued against the trial under the Act of 1740. The case of Charlotte Miller is identical with the present, and precludes all argument, unless for the purpose of reversing that unanimous adjudication. In answer to the proposition to reverse that decision, I will not depend altogether upon the doctrine of “ stare decisis” and the reasoning of the court in that case. The maxim, “ misera est servitas ubi jus est vaguere aut incognitum,” emphatically applies.
It is worthy of observation, that in the early cases, the question was mainly one of fact, to wit: was the party claiming exemption from the negro and slave disabilities, truly of free Indian descent ? If that appeared, “ ipso facto” the exemption followed. Thus stands without interruption a series of decisions, again .and again adjudged, in favor of the conquered Indian blood. But independent of so many adjudications, where can we find room for two rational opinions on the fair import of the statutory exception of “ Indians in amit.y ?” In 1740, the Indian tribes in South Carolina were many, and with those in the other Provinces, then all under the English Government, were computed to be 400. Who, in that position, were the “Indians in amity?” The proper answer, in default of direct evidence, is by the international laws of Kingdoms and States. These laws, ever since the establishment of Christianity in the Roman empire, pre-sup-pose a comity and friendly intercourse, amity among nations. This principle is the foundation of all modern reciprocal commerce among nations.
Our great statesman, Mr. Jefferson, expresses it in the declaration of independence, in what might be called a State maxim, &c. “as we hold other nations, enemies in war, in peace, friends.” This modern improvement in the international code is not questionable, and it supports the past liberal construction of the Act of 1740. It is moreover due to the sentiments and character of our progenitors of 1740, to the race of red men, and no less to their many descendants, ■pure or mixed, in the U. States, that we give the statutory exemption of “Indians in amity” no other construction than the one already made. There can be no inconvenience resulting from, or State policy requiring, a more confined or jealous construction to be now introduced. Ought we not, on the contrary, to be gratified by the historical fact, that while our an *451 cestors conquered the red man, and took his land, they did not also make him a slave to till it for his conquerors ? — which the opposite construction assumes. According to my own judgment, the just exposition of the terms “Indians in amity excepted,” is that their proper import is generic, and means all Indians not in hostility. But with many exceptions, as those of Indian slaves — Indians from time to time in hostility — or declared slaves, as the Yamassees were, or others to be de-dared slaves.
Every particular instance of their slavery is plainly an additional exception ; and not the illustration of a general rule —that Indians were slaves. The article Indians in the 2d volume of our Statutes indicates so much regulation of a free commerce with the tribes, and the early history of South Carolina points out such intercourse with them, that it would seem to violate fair reasoning and implied confidence, to apply to free Indians, as well as to Africans, the presumption that 'they were to be treated “prima facie” as of the slave class.
Any one who has read Mr. Calhoun’s letter to Mr. W. R. King, and that to Mr. Packingham, in 1844, on the subject of African slavery — that of Governor Hammond to Mr. Clarkson, and more especially the well considered discussion of the whole subiect by Dr. Mathew Estes, of Columbus, Mississippi, entitled “a defence of negro slavery, as it exists in the United States,” — a book destined to enlighten the public mind • — will perceive the reasons and good sense of our Act of 1740, in laying down the strong line of demarkation, in governing the Indian and negro races.
The whole State policy, in making slaves of Indians, was temporary, arising out of the necessities of frequent wars with the savage tribes. It was to deter their inroads, by the in-timidations of slavery, so hateful to Indian instincts. The Indians were reckless of their own life, and greedy of that of their enemy. They never made valuable slaves, but withered away in a state so alien to the red man’s nature. From the time of Las Cassas (1517) to the present day, this was visible and palpable. Dr. Estes says, “the continued health and vigor of the negro, in slavery, led Las Cassas to recommend a continuance of the institution, tho’ opposed to it in the abstract.’’ But reverse these characteristics of human nature, and you have equally and justly the picture of the negro race, as handed down from ages, of their history in Africa; as well as by the experience of them for two hun-, dred years in the United States; and this is equally the fact in the emancipating and planting States. All history assures ns that the negro race thrive in health, multiply greatly, become civilized and religious, feel no degradation, and are happy, when in subjection to the white race. Estes says, *452 “they feel and acknowledge their inferiority; and in consequence slavery is not in the least regarded as a degradation, but as their proper and natural position.” “No other people ever exhibited the same fidelity when in a state of slavery. The white or copper man, when enslaved, will leave no means-untried to effect his emancipation; but the negro, similarly situated, will not only neglect the use of means to effect, but will absolutely refuse the boon ot freedom when offered to him.” “I do not believe,”- he continues, “conscientiously, that one slave in ten could be induced to accept the offer of freedom if accompanied with the condition that they were to leave the United States. This has been attested again and again.”
The English Act of emancipation, for the West Indies, has laid down, virtually, a similar distinction between races. Dr, Estes says, “By the 44th section of the English Act, it is declared that it shall not extend to any of the territory in the possession of the East India Company, or the Island of Ceylon or St. Helena. The whole of the English East India possessions are filled with slaves, and the number is contim-ually increasing.”
Here we have the English exemption in favor of a few-black slaves, but the slave disabilities are continued to, perhaps, a hundred million of East India slaves.
This English Act illustrates “ e converso, our distinction in favor of “Indians in amity;” their’s is for the negroes, and against the East Indians. Let me finally add, that in a case, to say the least, of doubtful construction, not only adjudications and human sentiments, but comity with our sister States, where we have no counter policy, ought to have their influence.
As to human sentiment. Can we here, in our mother city of Charleston, where once the free born savage roamed independently through his own forest, or came down to fish off “ Oyster Point,” — can or ought we to strain, and that too in the face of former decisions — to hold in the category.of slaves, or bow to our slave code, the sparse remnants of the red man ? As to comity with our sister States. In the language of our declaration of independence, there is “ a decent regard "for the opinion of mankind.” And this sentiment especially inheres in confederated States. On this head, would not the “ ancient dominion” of Virginia, and all the blood of Pocahontas say, this-is not international — itis not like South Carolina? And might not certain other States ask, is she so deep in the cause of slavery, as to reverse her own decisions, in order to re-assume that the Red race, like the African black, comes within the curse of Noah upon Ham and his offspring ? Would not such a reversal of past adjudications be a libel upon our international spirit ? For such reasons I am for ad *453 hering to the decision in the case of Charlotte Miller v. Dawson and Brown, that spares the race of Shem.
The verdict is therefore set.aside “ ex debito justicias”
O’Neall, Evans and Wa&dlaw, JJ. concurred.

Motion granted.